UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | | |
|---|---|---|
| LISA NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12-cv-1125 |
| | ) | |
| v. | ) | Honorable Phillip J. Green |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **OPINION** |
| Defendant. | ) | |
| | ) | |

This is a social security action brought under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security denying plaintiff's claim for disability insurance benefits (DIB).  On March 4, 2009,  plaintiff filed her application for benefits, alleging a July 30, 2006, onset of disability.  (Page ID 948-54).  Her claim was denied on initial review.  (Page ID 897-900).  On May 20, 2011, plaintiff received a hearing before an ALJ, at which she was represented by counsel.  (Page ID 816-70).  On August 9, 2011, the ALJ issued a decision finding that plaintiff was not entitled to DIB benefits or a period of disability.  (Op., Page ID 798-807).  On August 28, 2012, the Appeals Council denied review (Page ID 789-791), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a complaint seeking judicial review of the Commissioner's decision. Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties voluntarily consented to have a United States Magistrate Judge conduct all

further proceedings in this case, including entry of final judgment.  (docket # 19).

Plaintiff asks the Court to overturn the Commissioner's decision on the following

grounds:

> 1. The ALJ "failed to give controlling weight" to the opinions of Doctors Gregory Stempky, D.O., Alexander Franko III,  M.D., Alejandro Nakahodo M.D., and Susan Hunt, LMSW "with whom the Claimant was treated collectively for over five years."
>
> 2. The ALJ "misinterpreted the records of treating psychologist Walter Parmelee, Ed.D."
>
> 3. The ALJ "misapplied the law through failure to follow Social Security Rules/regulations, and disregarded the Court's holding in a precedential case."

(Plf. Brief at 2, docket # 18, Page ID 1490).  The Commissioner's decision will be

affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to

determine whether the Commissioner's findings are supported by substantial evidence

and whether the Commissioner correctly applied the law.  *See Elam ex rel. Golay v.*

*Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772

(6th Cir. 2001).  Substantial evidence is defined as "'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"   *Heston v.*

*Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402

U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007).

The scope of the court's review is limited.  *Buxton*, 246 F.3d at 772.  The court does not

review the evidence *de novo*, resolve conflicts in evidence, or make credibility

determinations.  *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  . . .  This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73.  "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently."  *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013)("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion.").  "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from July 30, 2006, through the date of the ALJ's decision. (Op. at 3, Page ID 800). Plaintiff had not engaged in substantial gainful activity on or after July 30, 2006.[1]  (*Id.*).  Plaintiff had the following severe impairments:  "irritable bowel syndrome, major depressive disorder, and generalized anxiety disorder." (*Id.* at 4, Page ID 801). Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments.  (*Id.*).  The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: she cannot lift, carry, push and/or pull more than 20 pounds occasionally and 10 pounds frequently; stand and/or walk for more than a total of six hours in an eight-hour workday; sit for more than a total of six hours in an eight-hour workday; or concentrate to perform more than simple, routine job tasks.

(Op. at 5, Page ID 802).  The ALJ found that plaintiff's testimony regarding her subjective complaints was not fully credible.  (*Id.* at 5-8, Page ID 802-05).  Plaintiff was unable to perform any past relevant work.  (*Id.* at 9, Page ID 806). She was 38 years old as of her alleged onset of disability and 43 years old as of the date of the ALJ's decision.  Thus, plaintiff was classified as a younger individual at all times relevant to

---

[1]The ALJ considered the work that plaintiff performed as a nurse from September 1, 2008, to December 1, 2008, to be an unsuccessful work attempt.  (Op. at 4, Page ID 801).

-4-

her claim for DIB benefits.  (*Id.*).  Plaintiff has at least a high school education and is able to communicate in English.  (*Id.*).  The ALJ found that the transferability of job skills was not material to the determination of disability.  (*Id.*).

The ALJ then turned to the testimony of a vocational expert (VE).  In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 19,700 jobs in Michigan that the hypothetical person would be capable of performing.  (Page ID 862-64).  The ALJ found that this constituted a significant number of jobs.  Using Rule 202.21 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not entitled to DIB benefits or a period of disability.[2]  (Op. at 9-10, Page ID 806-07).

## 1.

Plaintiff argues that the ALJ committed reversible error when he failed to give controlling weight to the opinions of doctors Gregory Stempky, D.O., Alexander Franko III, M.D., Alejandro Nakahodo M.D., and Susan Hunt, LMSW "with whom the Claimant has treated with collectively for over five years."  (Plf. Brief at 2, Page ID

[2]The ALJ found that plaintiff was not entitled to a period of disability because she "applied for benefits on March 4, 2009, which was approximately 19 months after her period of disability ended." (Op. at 1, Page ID 798). "The regulations provide that a claimant must file an application for a period of disability while disabled, or no later than 12 months after the month in which the period of disability ends." (*Id.*) (citing 20 C.F.R. § 404.621). Plaintiff did not satisfy the requirements of the exception found in 20 C.F.R. § 404.322. (Op. at 1, Page ID 798). "Therefore, her application for benefits was not filed within 12 months after her period of disability ended and therefore, no period of disability c[ould] be established." (*Id.*). On Appeal, plaintiff does not claim an entitlement to a period of disability. She has not shown any error in the ALJ's application of the standards set forth in sections 404.322 and 404.621.

1490).  There is no "collective" treating physician rule.  Plaintiff's argument that the ALJ should have treated social worker Hunt's opinions as if they were the opinions of an acceptable medical source is contrary to applicable law.

The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner.  20 C.F.R. § 404.1527(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).  A treating physician's opinion that a patient is disabled is not entitled to any special significance.  *See* 20 C.F.R. §§ 404.1527(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician."); *accord Gentry v. Commissioner*, 741 F.3d 708 (6th Cir. 2014).  Likewise, "no special significance"[3] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling, deference.  *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011).  "[T]he opinion of a treating physician does not receive controlling weight merely

---

[3]"We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. § 404.1527(d)(3).

by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)); *see Gayheart v. Commissioner*, 710 F.3d 365, 376 (6th Cir. 2013) (A treating physician's medical opinion is entitled to controlling weight where "two conditions are met: (1) the opinion 'is well supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" (citing 20 C.F.R. § 404.1527(c)(2)). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight because it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the record, the opinion should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship,

supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. § 404.1527(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

A.   Doctors Nakahodo and Franko

On July 23, 2004, Dr. Nakahodo conducted a flexible sigmoidoscopy and attempted to perform a colonoscopy. He offered a postoperative diagnosis of irritable bowel syndrome. (Page ID 1293). Plaintiff has not identified any opinion expressed by Dr. Nakahodo which failed to receive appropriate weight.

Dr. Franko was plaintiff's former primary care physician. (Page ID 804). On November 2, 2005, Dr. Franko performed a new patient evaluation. (Page ID 1138). In January 2006, he offered a diagnosis of irritable bowel syndrome, depression, and tobacco abuse. (*Id.*). On April 10, 2006, Dr. Franko wrote that plaintiff had "a lot of social upheaval in her life right now. I think that is the etiology of her bowel

dysfunction." (Page ID 1137). Plaintiff's gallbladder was surgically removed without complication on July 11, 2006. (Page ID 1098-1101, 1134, 1220-21). On July 19, 2006, Brian Gluck, D.O., noted that plaintiff had no nausea and was feeling great. He indicated that plaintiff had a history of "IBS like symptoms," but was not experiencing any of those symptoms "at all" after her gallbladder surgery. (Page ID 1097). During the period from August 2006, through June 2007, Dr. Franko treated plaintiff for irritable bowel syndrome, obesity, anxiety and depression. (Page ID 1111-26). On May 10, 2007, Dr. Franko indicated that plaintiff's anxiety had improved and that her depressive disorder was stable. Among other things, Dr. Franko noted that plaintiff enjoyed daily activities, was not forgetful, did not experience memory loss, and had normal insight and judgment. (Page ID 1124). In July 2007, Dr. Franko completed a series of insurance forms asking him to evaluate plaintiff's mental status. He indicated that he would defer to the opinions of plaintiff's treating psychologist, Walter Parmelee. (Page ID 1133). Plaintiff has not identified any medical opinion expressed by Dr. Franko which failed to receive appropriate weight.

B.   Dr. Stempky

Plaintiff argues that the ALJ failed to give appropriate weight to Dr. Stempky's responses to an Irritable Bowel Residual Functional Capacity Questionnaire. (Plf. Brief at 2-3, Page ID 1490-91). The earliest progress notes from Dr. Stempky are dated February 1, 2008. Plaintiff complained of a cold and bronchitis. (Page ID 1161). On examination, Dr. Stempky's indicated that plaintiff was "normal" in all physical categories. (Page ID 1162). On March 5, 2008, plaintiff reported that she occasionally

experienced nausea from her irritable bowel syndrome and was asking for a refill of her Zofran prescription.   Plaintiff related that her psychiatric symptoms were under control.   Dr. Stempky renewed plaintiff's prescriptions for Seroquel, Ativan, and Zofran. Dr. Stempky "strongly encouraged" plaintiff to quit smoking cigarettes. (Page ID 1161).

On July 9, 2008, plaintiff reported that she was trying to quit smoking and was not taking any medication for her bipolar disorder.   She complained of nausea, vomiting, depression and anxiety and was seeking refills on her prescriptions for Ativan and Zofran. Dr. Stempky found that plaintiff was not in any acute distress and answered questions appropriately.   Dr. Stempky's progress notes indicate that they talked about plaintiff's diabetes and that he renewed plaintiff's Ativan prescription. (Page ID 1159).

On October 14, 2008, plaintiff returned to Dr. Stempky for a checkup.   She reported that she was "doing pretty well." (Page ID 1158).   She was working nights at Harbor Hospice.   She was having some trouble sleeping because she was working nights.   Stempky noted as follows:   "She is still mourning the loss of her son, but she is not suicidal and since she has stopped taking Celexa, she does not feel that she is any more depressed than what she was.   MEDS: Ativan, she is taking about three per day, and she takes Bentyl for her irritable bowel syndrome.   She is prescribed Buspar and Celexa but has not been taking them.   She takes Flexeril p.r.n.   She has been using the Seroquel and Risperdal and Zofran p.r.n.   She does admit she is still smoking." (*Id.*).   Plaintiff was not in any acute distress and she gave appropriate responses to Dr.

Stempky's questions.  He strongly encouraged plaintiff to quit smoking, increased her Seroquel prescription to help her sleep, renewed her Risperdal and Zofran prescriptions, and added a prescription for Temazepam.  (*Id.*).

On December 8, 2008, plaintiff reported that she was experiencing a great deal of stress related to the upcoming anniversary of her son's death.  She complained of nausea, vomiting, diarrhea, and depression.  Plaintiff reported that she did not check her blood sugars on a regular basis.  Dr. Stempky gave plaintiff prescriptions for Celexa, AcipHex for her stomach issues and renewed her prescriptions for Zofran and Temazepam. (Page ID 1156).  On December 19, 2008, plaintiff "denied any significant problems."  She was not in any acute distress.  Because plaintiff complained of nausea and vomiting, Dr. Stempky referred plaintiff to Dr. Powers.  (Page ID 1157).

On January 20, 2009, plaintiff reported to Dr. Stempky that the Celexa and Seroquel prescriptions helped.  Dr. Powers reported that plaintiff "just has irritable bowel syndrome and cyclical vomiting disorder."  (Page ID 1155).  Dr. Powers did not think that a scope was necessary and expressed a preference for continuing chronic PPI therapy."  Plaintiff told Dr. Stempky that she was doing a little better, but had recently lost her job.  She "was wondering about applying for disability because of her disk disorder."  (*Id.*).  Dr. Stempky concluded this progress note as follows: "I am going to refer Lisa to Bevin to discuss possibly getting social security benefits and we will see her back in three months for a recheck."  (*Id.*).

On April 20, 2009, plaintiff returned to Dr. Stempky for a checkup.  Plaintiff reported that she experienced nausea and vomiting about "twice in a two week period."

(Page ID 1154).  She denied any chest pain or shortness of breath.  She continued to smoke cigarettes against medical advice.  Plaintiff had good distal pulses.  Plaintiff reported that she had been taking her medications and that they did keep her mood stabilized.  (*Id.*).  Dr. Stempky renewed plaintiff's Risperdal prescription and once again strongly encouraged her to stop smoking.  (Page ID 1154).

On July 28, 2009, plaintiff reported that she continued to smoke about a pack of cigarettes per day.  She denied any chest pain or shortness of breath.  She related that she had less trouble with diarrhea since she began increasing the amount of Vicodin she was taking.  She reported that she was doing okay, but was a little bit more depressed than usual.  (Page ID 1258).  On August 7, 2009, Dr. Stempky prescribed Synthroid for hypothyroidism.  (Page ID 1257).  On October 13, 2009, Dr. Stempky increased plaintiff's Synthroid to 100 mg. and renewed her Vicodin and Flexeril because she reported experiencing "a little bit of back pain."  (Page ID 1257).

On November 2, 2009, plaintiff returned to Dr. Stempky for a checkup on her diabetes.  Plaintiff reported that she was doing okay.  She denied any headaches, blurry vision, chest pain or shortness of breath.  Plaintiff reported that she was experiencing nausea and diarrhea.  She continued to smoke a pack of cigarettes per day.  Dr. Stempky found that plaintiff was not in any acute distress.  Her lungs were clear.  Dr. Stempky indicated that he was going to start plaintiff on "Glucophage 500 mg with her biggest meal a day."  (Page ID 1358).

On December 16, 2009, plaintiff reported that a day earlier she had experienced extremely high blood sugars.  She had been directed to go to the emergency room and

reported that she slipped an fell before going to the emergency room.  She complained of lower back pain.  Dr. Stempky gave plaintiff a prescription for Norco for pain relief.  In addition, he offered a diagnosis of uncontrolled diabetes and he adjusted her medications.  Plaintiff gave Dr. Stempky forms to fill out in support of her disability claim.  (Page ID 1356).  On December 21, 2009, Dr. Stempky found that plaintiff's blood sugars had improved, but remained high.  (Page ID 1355).  On December 30, 2009, plaintiff reported another fall, this time having slipped on ice on Christmas Eve.  She continued to report cyclical vomiting "every once in a while."  (Page ID 1355).

On December 30, 2009, Dr. Stempky completed an "Irritable Bowel Syndrome Questionnaire" for plaintiff's attorney.  (Page ID 1277-80).  Among other things, Stempky marked boxes on this form asserting that plaintiff was unable to work and that her symptoms would constantly interfere with the concentration and attention needed to perform even simple work tasks.  (*Id.*).

On January 11, 2010, plaintiff related that her pain was "just about gone."  (Page ID 1352). Her blood sugars were "running very well" and she was tolerating her medication "without any increase in her nausea."  (*Id.*).  On February 4, 2010, plaintiff indicated that she was experiencing fewer problems with irritable bowel symptoms.  (Page ID 1351).  On March 4, 2010, Dr. Stempky again encouraged plaintiff to quit smoking.  (Page ID 1351).

On March 29, 2010, plaintiff reported that she felt better after taking someone else's prescription  medication.  She asked Dr. Stempky to give her a prescription for Adderall: "Lisa comes into the clinic today following up on her bipolar disorder as well

-13-

as she wants to try Adderall.  She reports that she has had trouble her whole life with focusing.  Her daughter is on Adderall and she tried one of her daughter's Adderall and she actually felt much better.  She was able to focus.  She reports that she was feeling really good on Abilify."  Dr. Stempky gave plaintiff a prescription for "Adderall 20 mg. twice a day."  (Page ID 1349).

On April 19, 2010, plaintiff appeared at Dr. Stempky's office to have him fill out forms for her disability.  Plaintiff reported that she was "feeling very good" while taking a combination of Abilify and Adderall.  She continued to smoke a pack of cigarettes per day.  Her strength was 5/5 in the upper and lower extremities and equal bilaterally.  She walked with a normal gait.  (Page ID 1348).

On August 9, 2010, Dr. Stempky indicated that after taking plaintiff off Seroquel and putting her back on Abilify six months earlier, plaintiff had been "doing well mentally and she ha[d] lost 50 pounds."  (Page ID 1340).

On February 22, 2011, Dr. Stempky signed a one-sentence letter which stated as follows:  "I have reviewed the Irritable Bowel Residual Functional Capacity Questionnaire dated December 30, 2009, and believe Ms. Nelson's limitations remain the same."  (Page ID 1411).

The ALJ carefully considered Dr. Stempky's opinions and found that the limitations that he suggested were not well supported by objective evidence and were inconsistent with the record as a whole, including his own treatment notes:

> The record indicates that the claimant initiated treatment for her general medical concerns with G. Stempky, D.O. in February 2008.  He continued to prescribe medication therapy for her IBS, depression, and anxiety; he

also monitored her diabetes and advised weight reduction and cessation of tobacco use.  When examined in mid-October 2008, the claimant reported that while she was still mourning the death of her son the previous December, she had ceased her use of the antidepressant Celexa, as well as her antianxiety agent Buspar.  He noted her report that "overall, she is doing pretty well."  Dr. Stempky noted her report of increased nausea and vomiting when examined in early December 2008, which she attributed to increased stress due to the approaching anniversary of her son's death.  He noted her denial of "any significant problems" at her next exam in late December 2008.  She had re-initiated her use of Celexa and subsequently reported it to be helpful.  When examined in late April 2009, she reported that she was typically experiencing nausea and vomiting twice within a two-week period at this point in time.  The medication therapy for the claimant's IBS and emotional symptoms continues to be monitored and revised as necessary (Exhibits 5f, 7f, 12f, 17f, and 23f).

The undersigned notes, with interest, that Dr. Stempky's treatment notes contain no reports from the claimant of experiencing any IBS symptoms after April 2009 until December 2009 (Exhibits 5f and 17f/p. 18).  His treatment notes throughout 2010 repeatedly stated that the claimant is "doing well overall" with regard to her IBS (Exhibit 17f).  There is little evidence to indicate that she required frequent emergent symptoms for IBS symptoms unresponsive to her medication therapy.

Although the evidence of record indicates the claimant has been assessed to have depressive and anxiety disorders, the overall record is not reflective of emotional symptoms experienced by the claimant to a debilitating degree, as would be suggested by a history of repeated hospitalizations for mental health treatment.

* * *

The undersigned accords little weight to the opinion offered in December 2009 from Dr. Stempky regarding the claimant's physical limitations as such appears to be based upon the claimant's subjective complaints (Exhibit 13f).  The overall evidence of record clearly indicates that the claimant's IBS symptoms fluctuate and have not been experienced at the frequency or severity reflected within Dr. Stempky's assessment on a regular and consistent basis.

-15-

(Op. at 7-8, Page ID 804-05). The Court finds no violation of the treating physician rule. The underlying progress notes did not support the level of restriction Dr. Stempky suggested in his questionnaire responses. The Sixth Circuit has consistently held that inconsistencies between proffered restrictions and the underlying treatment records are good reasons for discounting a treating source's opinions. *See e.g., Hill v. Commissioner*, 560 F. App'x 547, 549-50 (6th Cir. 2014); *Fry v. Commissioner*, 476 F. App'x 73 (6th Cir. 2012).

   C.   <u>Psychologist Parmelee</u>

   Plaintiff argues that the ALJ appears to have "misinterpreted" Dr. Parmelee's records because he failed to list the exact number of times that plaintiff saw Parmelee and failed to note in his opinion that in plaintiff's last visit in February 2008, Dr. Parmelee "indicated that the Claimant suffered from being anxious, on edge, sad, depressed, fatigued, poor appetite, sleep disturbance, and upset stomach." (Plf. Brief at 5-6, Page ID 1493-94). Plaintiff saw Dr. Parmelee during the period from September 5, 2006, through February 27, 2008. (Page ID A.R. 503-28). The ALJ was not required to reproduce every progress note or list the exact number of visits. Further, although February 2008 progress note contains a list of plaintiff's subjective complaints, the point that Dr. Parmelee emphasized in the progress note was that plaintiff's condition was improving and that she was looking forward to getting back to work:

> Lisa is still having some bad days where she just wants to sleep and avoid but they are less frequent and she gets back on track the next day. She has more focus now. She did get the application out for her old position at the hospital and has done a follow up call on it. She is looking forward

to getting back to work at least part time.  She feels that the structure and purpose will be good for her.

(Page ID 1303).

A review of the treatment records confirms that the ALJ did not "misinterpret" Dr. Parmelee's records.  On September 5, 2006, plaintiff told Dr. Parmelee that she had recently had her gallbladder removed and felt very ill in the mornings.  She reported that she had been divorced for two years and that her ex-husband had moved out of the country to avoid paying child support. Plaintiff indicated that she would check with Dr. Franko about a possible stress/medical leave from her job.  (Page ID 1327).  On September 13, 2006, plaintiff reported to Psychologist Parmelee that she was on "stress leave" from her job.  She continued to complain of "feeling anxious, on edge, depressed at times, fatigued, poor appetite, [] times of being very nervous, withdrawn, sleep is disturbed, increased need for sleep, upset stomach." (Page ID 1327).  Plaintiff reported that she was relieved to be on leave from work but at the same time feeling stress because of it.  She indicated that she was a single parent who was busy trying to keep things going with her kids' schedules.  She reported that the Ativan she was taking helped with anxiety, but stated that she was feeling pressure from her doctor and boyfriend not to take it.  (Page ID 1326).  In October 2006, plaintiff stated that she felt guilty about taking a trip to Maine with her boyfriend and leaving the children with her mother.  (Page ID 1326).  In November 2006, plaintiff reported feeling guilty about not going back to work.  She indicated that she traveled to Grand Rapids, attended a Bob Seger concert, stayed overnight, and had a good time.  (Page ID 1324-25).

On January 10, 2007,  plaintiff reported stress related to the foreclosure of her home.  (Page ID 1322).  On January 29, 2007, Psychologist Parmelee completed a questionnaire for her employer's disability insurance provider and he indicated that plaintiff was "currently unable to work" and that the restrictions he suggested were "temporary." (Page ID 1317-18).

In early March 2007, plaintiff reported that she had broken up with her boyfriend and that she felt less anxious now that he was out of her life.  (Page ID 1313).  On March 28, 2007, plaintiff reported that her application for long-term disability benefits through her employer had been approved.  (Page ID 1312). Plaintiff's boyfriend returned in March and stayed until June.  (Page ID 1309-11).

In June 2007, plaintiff reported stress related because she had to go to court because she had been accused of shoplifting.  (Page ID 1310).  In July 2007, she received papers notifying her to vacate the house by the end of the month.  (Page ID 1309). On July 16, 2007, Psychologist Parmelee sent a letter to the insurer offering his opinion that plaintiff would be unable to return to her "former fulltime position because of continued symptoms of anxiety and depression."  Psychologist Parmelee encouraged plaintiff to begin the process of getting back to work.  He recommended that plaintiff "look for a different work environment."  (Page ID 1307-08).

In August 2007, plaintiff moved back in with her parents.  (Page ID 1306).  In November 2007, she pleaded guilty to shoplifting.  She reported that he had been placed on probation for six months and was required to take a six-week class at MCC. (Page ID 1305).  Plaintiff's son was killed in a December 2007 car accident.  (Page ID

830, 1305).  Plaintiff struggled the next few months dealing with the loss of her son.

(Page ID 1304).  In February 2008, plaintiff reported that she was going to fill out an

application for her old job, that she had an appointment with human resources, and

was ready to get back to work part time at least.  (Page ID 1303).  Progress notes from

the next appointment indicate that plaintiff's employer was receptive to having

plaintiff come back to work on a part-time schedule.  (Page ID 1303).  The last progress

notes from Psychologist Parmelee's office are dated March 26, 2008.  The entry states

that plaintiff canceled her appointment.  (Page ID 1302).

Plaintiff argues that the ALJ should have given greater weight to the RFC

restrictions that Psychologist Parmelee suggested in his January 2007 questionnaire

responses.  (Plf. Brief at 6, Page ID 1494) (citing AR 518-521, found at Page ID 1317-

20).  The ALJ stated that plaintiff would have been found disabled during this period

in 2007 if she had not waited until March 4, 2009, to file her application for benefits.

(Op. at 1, Page ID 798).   "[W]hile the claimant may have had more significant

limitations from July 2006 through July 2007, this period of time is too far removed

from her application date in March 2009."  (*Id.* at 8, Page ID 805).  The Court finds no

error.

### D.   Ms. Hunt

The treating physician rule did not apply to the opinions of Ms. Hunt because

social workers are not "acceptable medical sources."  *See* 20 C.F.R. §§  404.1513(a),

(d)(3); *see also Payne v. Commissioner*, 402 F. App'x 109, 119 (6th Cir. 2010); *Geiner v.

Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008); *Hayes v. Commissioner*, No. 1:09-cv-1107,

2011 WL 2633945, at * 6 (W.D. Mich. June 15, 2011). No opinion expressed by Ms. Hunt was entitled to controlling weight. Only "acceptable medical sources" can: (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule. *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006 WL 2329939, at * 2 (SSA Aug. 9, 2006)). The opinions of social workers fall within the category of information provided by "other sources." *Id.* at * 2; *see* 20 C.F.R. § 404.1513(d)(3). The social security regulations require that information from other sources be "considered." 2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§ 404.1513). This is not a demanding standard. It was easily met here. (Op. at 7-8, Page ID 804-05).

### 3.

Plaintiff's third claim of error is that the ALJ "misapplied the law through failure to follow Social Security Rules/regulations, and disregarded the Court's holding in a precedential case." (Plf. Brief at 2, Page ID 1490). The case that plaintiff cites is *Lashley v. Secretary of Health & Human Servs.*, 708 F.2d 1048 (6th Cir. 1983). (Plf. Brief at 10, Page ID 1498). Plaintiff's argument is more readily quoted than summarized:

> In *Lashley*, the Court held it is the Commissioner's duty to develop the record fully and provide a full and fair hearing for the Claimant. The Commissioner's acceptance of one non-acceptable medical source opinion while completely disregarding the opinions of another indicates a biased opinion that prevents the claimant from receiving a full and fair hearing. In reality, L.M.S.W. Hunt's certifications represent proof of acceptability."

(Plf. Brief at 10, Page ID 1498). The above-quoted argument lacks merit. In *Lashley*, the claimant, Jack Lashley, appeared for his hearing "without the assistance of an attorney." 708 F.2d at 1050. He had a fifth-grade education and was suffering from the residuals of several strokes. *Id.* "Lashley possessed limited intelligence, was inarticulate, and appeared to be easily confused." *Id.* at 1052. The ALJ's questions were "superficial" and entire hearing transcript was only 11 pages long. *Id.* Under those circumstances, the Sixth Circuit held that the ALJ fell short of satisfying his "special duty" to the *pro se* litigant to develop the record. *Id.* at 1052-53. The ALJ's special duty to *pro se* parties to develop the record does not extend to plaintiff, because she was represented by an attorney at the hearing. *See Smith v. Commissioner*, 473 F. App'x 443, 445 (6th Cir. 2012); *Kelly v. Commissioner*, 314 F. App'x 827, 831 n. 1 (6th Cir. 2009); *see also Lang v. Commissioner*, No. 1:14-cv-651, 2015 WL 3767785, at * 3 (W.D. Mich. June 17, 2015). Further, the ALJ is responsible for weighing conflicting evidence, not the Court. *See DeLong v. Commissioner*, 748 F.3d 723, 726 (6th Cir. 2014); *Buxton*, 246 F.3d at 775; *see also White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009).

The record contains no evidence that the ALJ was "biased" against plaintiff. Plaintiff presents nothing approaching the convincing evidence of actual bias necessary

to overcome the presumption that the ALJ was impartial.  The ALJ is presumed to have exercised his powers with honesty and integrity, and the plaintiff has the burden of overcoming the presumption of impartiality "with convincing evidence that a risk of actual bias or prejudgment is present." *Collier v. Commissioner*, 108 F. App'x 358, 364 (6th Cir. 2004) (citing *Schweiker v. McClure*, 456 U.S. 188, 196 (1982), and *Navistar Int'l Transp. Corp v. EPA*, 921 F.2d 1339, 1360 (6th Cir. 1991)); *see Bailey v. Commissioner*, 413 F. App'x 853, 856 (6th Cir. 2011) ("We presume that judicial and quasijudicial officers, including ALJs, carry out their duties fairly and impartially."). Plaintiff has the burden of providing "convincing evidence that a risk of actual bias or prejudgment is present." *See Bailey*, 413 F. App'x at 856.  For the alleged bias to be disqualifying, it must "stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *see Miller v. Barnhart*, 211 F. App'x 303, 305 n.1 (5th Cir. 2006).  "[A]ny alleged prejudice on the part of the decisionmaker must be evident from the record and cannot be based on speculation or inference." *Carrelli v. Commissioner*, 390 F. App'x 429, 436-37 (6th Cir. 2010); *see Perschka v. Commissioner*, 411 F. App'x 781, 788 (6th Cir. 2010) ("An adverse ruling alone is not enough to support a finding of bias.").  "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" are insufficient to establish bias.  *Liteky v. United States*, 510 U.S. 540, 555-56 (1994).   The Court finds no

evidence that the ALJ was biased against plaintiff, much less the convincing evidence of actual bias that is necessary to overcome the presumption of impartiality.

## **Conclusion**

For the reasons set forth herein, a judgment will be entered affirming the Commissioner's decision.

Dated:   July 29, 2015          /s/  Phillip J. Green_____
                                United States Magistrate Judge